UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| VENETHIA COOK, individually, et al., | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 1:22-CV-00121-JPB |
| COBB COUNTY, GEORGIA, et al., | |
| Defendants. | |

## <u>ORDER</u>

This matter is before the Court on Cobb County, Georgia, and Max

Hamilton Karneol's (collectively, "Defendants") Motion to Dismiss [Doc. 17].

This Court finds as follows:

## BACKGROUND

This cases arises from the July 2020 death of Vincent Demario Truitt

("Decedent"), who was fatally shot by Max Hamilton Karneol ("Officer Karneol"),

a police officer employed by the Cobb County Police Department.  On January 11,

2022, Venethia Cook, in both her individual capacity and as administrator of the

Estate of Vincent Demario Truitt, and Andrae Truitt (collectively, "Plaintiffs")

brought suit against Defendants.  [Doc. 1].  Plaintiffs asserted the following causes

of action:  (1) excessive force in violation of the Fourth Amendment; (2) abuse

during the course of arrest in violation of the Georgia Constitution; (3) violation of the Fourth Amendment (official capacity claim against Cobb County only); (4) wrongful death; (5) negligence in the performance of ministerial duties; (6) assault and battery; (7) damages pursuant to 42 U.S.C. § 1988; and (8) punitive damages. [Doc. 11].

On February 7, 2022, Defendants filed the instant Motion to Dismiss.  [Doc. 17].  Defendants attached several exhibits to their motion, including the body and dash camera recordings from Officer Karneol.  [Docs. 28 and 29].  The motion is now ripe for review.

In this case, the Court must first decide whether it can consider the video exhibits attached to Defendants' Motion to Dismiss.  As a general rule, courts are not permitted to look beyond the pleadings when deciding a Rule 12(b)(6) motion.  Kalpakchian v. Bank of Am. Corp., 832 F. App'x 579, 582 (11th Cir. 2020).  An exception to this general rule exists, however.  The Eleventh Circuit Court of Appeals has adopted the "incorporation by reference" doctrine, which allows a court to consider documents attached to a motion to dismiss if the documents are "referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity."  Hi-Tech Pharms., Inc. v. HBS Int'l Corp., 910 F.3d 1186, 1189 (11th Cir. 2018).

Analyzing the rule stated above, the Court must first decide whether the extrinsic evidence was referred to in the complaint.  In this case, Plaintiffs' Complaint specifically states that both the vehicle chase and the fatal shooting of Decedent were recorded by Officer Karneol.  [Doc. 11, pp. 11-12].  Because Plaintiffs referenced the videos in their Complaint, the first element of the incorporation by reference test is satisfied.[1]

The Court must next analyze whether the extrinsic evidence is central to Plaintiffs' claim.  Plaintiffs do not contend that the centrality requirement is not satisfied.  The Court finds that because the videos captured the incident between Decedent and Officer Karneol, the videos are central to Plaintiffs' claims.

As to the final element—undisputed authenticity—a court must find that the authenticity of the evidence is not challenged.  "A plaintiff can dispute the authenticity of a document simply by saying that the proffered document is not the one referred to in her complaint."  Kalpakchian, 832 F. App'x at 583.  In this case, Plaintiffs do not claim that either of the video exhibits are not the videos

---

[1] Plaintiffs argue that the incorporation by reference doctrine does not apply because they did not attach the videos as exhibits to the Complaint.  [Doc. 21, p. 3].  This argument is not persuasive because the Eleventh Circuit has made clear "that a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint."  Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005).

referenced by Plaintiffs' in their Complaint.  Cf. Horsley, 832 F. App'x at 583
(holding that the plaintiff properly challenged authenticity because the plaintiff
asserted that the evidence attached to the motion to dismiss was not the same
evidence referenced in his complaint).  In other words, Plaintiffs do not argue that
the car chase depicted on the dash camera is a different car chase or that the
shooting depicted on the body camera is the shooting of a different individual.
Rather, Plaintiffs contend that Defendants have failed to show that the videos are
what they are purported to be.  Plaintiffs state that "[t]here is no foundation
regarding how the video[s] [were] recorded, who was in custody of the video[s]
after the shooting, and whether any additions or deletions were made to the
videos."  [Doc. 21, pp. 4-5].  Essentially, Plaintiffs assert that Defendants failed to
lay the proper foundation for the video evidence.

In Defendants' reply brief, Defendants provided the Declaration of Pamela
Turner, who is the Cobb County Police Department's Record Custodian.  [Doc. 24-
1].  In her declaration, Turner states that the videos attached to the Motion to
Dismiss are "true and accurate depictions of the original videos maintained in the
regular course of business of the Cobb County Police Department."  Id. at 3.
Because Turner laid the proper foundation for the videos in question, no dispute

exists as to the authenticity of the documents.  As such, the Court finds that the final element is also satisfied.

To summarize, the Court finds that the incorporation by reference doctrine applies because the videos are referred to in Plaintiffs' Complaint, are central to Plaintiffs' claims and are of undisputed authenticity.  As such, the Court will consider the videos in resolving the instant motion.  See Cantrell v. McClure, 805 F. App'x 817, 819 n.2 (11th Cir. 2020) (holding that in a qualified immunity case the district court did not err by considering police dashboard camera footage because the video footage was referenced in the complaint).

## FACTS

The relevant facts, as presented by Plaintiffs' Complaint and as depicted on the video recordings, are as follows:

On the evening of July 13, 2020, Decedent was a passenger in a stolen 2014 Nissan Altima.  [Doc. 11, p. 6].  In total, there were three individuals in the stolen car:  the driver; Decedent, who sat in the front seat; and a backseat passenger.

While on patrol that same evening, Officer Karneol "got a hit from his patrol vehicle's computer of a possible stolen Nissan that fit the description of the vehicle in which [Decedent] was a passenger."  Id. at 7.  Shortly thereafter, Officer Karneol intercepted the Nissan Altima, activated his emergency equipment to

initiate a traffic stop and followed the vehicle to a QuikTrip gas station.  Id. at 9;
[Doc. 28 at 13:57-14:14].  Despite the activation of his emergency equipment and
the presence of other officers, the driver did not stop the vehicle.  [Doc. 28 at
13:57-14:14].  Instead, the driver recklessly drove through the QuikTrip parking
lot.  Id.  A police officer attempted a PIT maneuver to stop the vehicle.  [Doc. 11,
p. 9; Doc. 28 at 14:14-14:22].  Although contact was made, the maneuver was
unsuccessful, and the driver continued to evade officers by jumping a curb, driving
over a traffic control sign and speeding down Riverside Parkway.  [Doc. 11, p. 9;
Doc. 28 at 14:22-14:35].

A high-speed chase ensued for the next one minute and nineteen seconds.
[Doc. 28 at 14:26-15:45].  During this period of time, another PIT maneuver was
attempted, and the Nissan Altima spun in a circle.  [Doc. 11, p. 10; Doc. 28 at
14:22-15:01].  The Nissan Altima, however, did not stop, and continued to the rear
parking lot of a commercial warehouse.  [Doc. 11, p. 10].  Once there, a final PIT
maneuver was performed, and the Nissan Altima came to a stop.  Id.

Immediately thereafter, the driver, Decedent and the backseat passenger
exited the vehicle and fled the officers.  Id.  Decedent was second to exit the
vehicle since he exited from the driver's side door after the driver.  [Doc. 28 at
15:45-15:50].

Officer Karneol immediately began pursuit of Decedent.  Id.  When the pursuit began, Officer Karneol's firearm was holstered.  Id.  Decedent had a black object in his right hand as he fled Officer Karneol.  [Doc. 29 at 00:35-40; Doc. 14-3, p. 2].  As Decedent continued to run while holding the black object, Officer Karneol unholstered his service weapon and, without warning, fired two shots, which hit Decedent in the shoulder and buttocks.  Id. at 00:39-00:42.  This sequence of events took approximately three seconds.

Decedent immediately fell to the ground and was handcuffed by Officer Karneol.  Id. at 1:00-1:05.  The footage from Officer Karneol's body camera shows a dark handgun on the ground very close to where Decedent fell.  Id. at 00:42-00:52; [Doc. 14-3, p. 8].  After Decedent was handcuffed, Decedent asked Officer Karneol, "why did you shoot me?"  [Doc. 29 at 1:25-1:28].  Officer Karneol responded, "because you pulled a gun on me!"  Id. at 1:29.

After Decedent fell to the ground, the video shows that Officer Karneol rendered aid to Decedent.[2]  More specifically, for over seven minutes and until paramedics arrived, Officer Karneol and other officers performed CPR.  Id. at

---

[2] Plaintiffs alleged in their Complaint that after the shooting, Officer Karneol "did not aid or assist in any life saving measures."  [Doc. 11, p. 13].  This allegation is directly refuted by video evidence.  See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (holding that where video footage clearly contradicted plaintiff's allegations, a court should view the facts in the light depicted by the video evidence).

4:15-11:15.  During this time, Officer Karneol repeatedly tried to keep Decedent alert and responsive.  No less than thirty times, Officer Karneol engaged Decedent with phrases like "talk to me," "what's your name," "where is it hurting," "stay with us" and "keep breathing."  Id. at 1:30-11:15.  Despite these efforts, Decedent died.  [Doc. 11, p. 11].

## LEGAL STANDARD

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff."  Traylor v. P'ship Title Co., 491 F. App'x 988, 989 (11th Cir. 2012).  Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although detailed factual allegations are not necessarily required, the pleading must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A complaint is insufficient if it only tenders naked assertions devoid of further factual enhancement.  Id.  Importantly, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (citation omitted).  At bottom, the complaint must contain more than "an unadorned, the-defendant-

unlawfully-harmed-me accusation," id., and must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Traylor, 491 F. App'x at 990 (quoting Iqbal, 556 U.S. at 678).  While all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, a court need not accept as true the plaintiff's legal conclusions, including those couched as factual allegations.  Iqbal, 556 U.S. at 678.

Accordingly, evaluation of a motion to dismiss requires two steps:  (1) a court must eliminate any allegations in the pleading that are merely legal conclusions, and (2) where there are remaining well-pleaded factual allegations, a court must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.

## DISCUSSION

In their motion, Defendants argue that all of the claims are subject to dismissal.  More specifically, Defendants contend that the federal claims are barred by qualified immunity.  As to the state claims, Defendants contend that they are barred by sovereign immunity.

### 1.  Qualified Immunity

As stated above, Defendants argue that the federal claims should be dismissed because Officer Karneol is entitled to qualified immunity.  The defense of qualified immunity is ordinarily addressed at the summary judgment stage of a case.  Chesser v. Sparks, 248 F.3d 1117, 1121 (11th Cir. 2001).  Nevertheless, the Eleventh Circuit has held that it may be raised and considered on a motion to dismiss.  St. George v. Pinellas Cnty., 285 F.3d 1334, 1337 (11th Cir. 2002).  In fact, because qualified immunity is a "'defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible.'"  Paez v. Mulvey, 915 F.3d 1276, 1284 (11th Cir. 2019) (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)).

As a general principle, "[q]ualified immunity protects public officers 'from undue interference with their duties and from potentially disabling threats of liability.'"  Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982)).  Indeed, qualified immunity shields "government officials 'performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir.

2019) (quoting <u>Harlow</u>, 457 U.S. at 818).  Importantly, qualified immunity protects

"'all but the plainly incompetent or those who knowingly violate the law.'"  <u>Id.</u>

(quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

"[T]o establish qualified immunity, a defendant must first show that [he]

was acting within the scope of [his] discretionary authority at the time of the

alleged misconduct."  <u>Paez</u>, 915 F.3d at 1284.  Here, Plaintiffs concede that Officer

Karneol was acting within the scope of his discretionary authority.  [Doc. 21, p.

12].  Because the issue is not disputed, the Court thus finds that Officer Karneol

was acting within the scope of his discretionary authority.

Once a defendant makes the required showing, as is the case here, "the

burden shifts to the plaintiff to show that qualified immunity is not appropriate."

<u>Paez</u>, 915 F.3d at 1284.  An arresting officer is entitled to qualified immunity

unless the plaintiff shows that:  (1) the defendant violated a constitutional right;

and (2) the violated right was clearly established at the time of the incident.  <u>Id.</u>

Importantly, "'[b]oth elements of this test must be present for an official to lose

qualified immunity.'"  <u>Rivera v. Carvajal</u>, 777 F. App'x 434, 437 (11th Cir. 2019)

(quoting <u>Brown v. City of Huntsville</u>, 608 F.3d 724, 734 (11th Cir. 2010)).  For the

reasons explained below, Plaintiffs have not met their burden on either of the

elements.

a.  <u>Whether Officer Karneol violated a constitutional right</u>

The Court will first analyze "whether [the] plaintiff's allegations, if true, establish a constitutional violation." <u>Keating v. City of Miami</u>, 598 F.3d 753, 762 (11th Cir. 2010) (alteration in original) (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 736 (2002)).  The Court construes the facts alleged "'in the light most favorable to the party asserting the injury.'" <u>Lee</u>, 284 at 1194 (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)).

In this case, Plaintiffs contend that Officer Karneol violated Decedent's Fourth Amendment right to be free from excessive force.  "Any claim that a law enforcement officer used excessive force—whether deadly or not—during a seizure of a free citizen must be analyzed under the Fourth Amendment's 'reasonableness' standard." <u>Garczynski v. Bradshaw</u>, 573 F.3d 1158, 1166 (11th Cir. 2009) (per curiam) (citing <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989)). Under this rule, a court must ask whether the force used was "'objectively reasonable in light of the facts confronting the officer.'" <u>Brown v. Nocco</u>, 788 F. App'x 669, 674 (11th Cir. 2019) (quoting <u>Mobley v. Palm Beach Cnty. Sherriff Dep't</u>, 783 F.3d 1347, 1353 (11th Cir. 2015)).  This determination is made "from the perspective of a reasonable officer on the scene" and not "with the 20/20 vision of hindsight." <u>Mobley</u>, 783 F.3d at 1353.  Significantly, the Supreme Court of the

United States has recognized that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397.

It is important to note that "[t]he 'law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.'" Powell v. Snook, 25 F.4th 912 (11th Cir. 2022) (quoting Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007)).  Instead, an officer may use deadly force when he:

> (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible.

Perez v. Suszczynski, 809 F.3d 1213, 1218-19 (11th Cir. 2016) (quoting Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013)).

In determining whether an officer has probable cause to believe that the suspect poses a threat of serious physical harm to the officer or others, a court must look to the "level and immediacy" of the threat.  Powell, 25 F.4th at 922.  This factor essentially asks a court to determine "whether, given the circumstances, the

suspect would have appeared to reasonable police officers to have been gravely dangerous." Penley v. Eslinger, 605 F.3d 843, 851 (11th Cir. 2010) (alteration omitted).

Plaintiffs contend that Decedent did not pose a serious threat to Officer Karneol or others.[3]  The Court disagrees.  Here, Decedent was carrying a weapon in his hand while fleeing the police.  Decedent had also been a participant in a high-speed car chase.  These facts show that Decedent would have appeared to a reasonable police officer to be gravely dangerous.  The Court recognizes that "the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit." Perez, 809 F.3d at 1220.  However, when a suspect's gun is "available for ready use," an officer is "not required to wait and hope for the best." Powell, 25 F.4th at 922.  Here, Decedent's weapon was in his hand, and Decedent could have decided to use the gun at any point

---

[3] Plaintiffs offered several conclusory allegations as to whether Decedent posed a threat to officers.  For instance, Plaintiffs alleged that "[w]hile [Decedent] was exiting the vehicle, he posed no danger to [Officer Karneol] or any other officer." [Doc. 11, p. 11]. Plaintiffs also alleged that Decedent "did not pose an imminent threat of death or serious bodily harm to [Officer Karneol] or anyone else when he was intentionally shot." Id. at 12.  The Court will not consider these allegations because "[t]here are no allegations of actual fact indicating that [Decedent] was non-threatening." See Corbitt, 929 F.3d at 1322 n.18.  For example, Plaintiffs do not allege that Decedent was unarmed or that he was compliant with any of the officer's commands or any other fact which would show that Decedent was not dangerous. See id. (comparing a "conclusory allegation" to an "actual fact").

against Officer Karneol.  Ultimately, the Court finds that this factor weighs in favor of a finding that Officer Karneol's use of force was reasonable.  See Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010) (holding that an officer was entitled to qualified immunity regardless of whether the suspect had pointed the gun at the officer because the suspect's gun was available for ready use and the officer was not required to wait and hope for the best); see also Montoute v. Carr, 114 F.3d 181, 185 (11th Cir. 1997) (determining that an officer was entitled to qualified immunity even where an armed suspect never turned to face the officer because the suspect could have turned "in a split second").

The second factor requires a court to analyze whether the officer reasonably believed that the use of deadly force was necessary to prevent escape.  Because Decedent was fleeing the police, this factor weighs in favor immunity.  Cf. Perez, 809 F.3d at 1219 (finding that the second factor was not satisfied because there was no indication that the individual shot by the officer was actively resisting arrest or attempting to flee).  Here, not only was Decedent a participant in a car chase, but after the vehicle was stopped, Decedent still did not surrender.  Instead, he continued to flee.

The final factor asks a court to analyze whether the officer gave some warning about the possible use of deadly force, if feasible.  Here, it is undisputed

that Officer Karneol did not warn Decedent before discharging his weapon. Significantly, the Eleventh Circuit has "declined to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where such a warning might easily have cost the officer his life." Powell, 25 F.4th at 922.  In fact, the Eleventh Circuit has made clear that it has never held that "an officer must always warn a suspect before firing."  Id. at 922-23.

Only three seconds passed from the time Officer Karneol began chasing Decedent to the time of the shooting.  Given this extremely brief period of time, the Court finds that it was not feasible for Officer Karneol to issue a warning before shooting Decedent.  Accordingly, this factor weighs in favor of immunity.

In sum, after considering the three factors and the pertinent facts, the Court finds that Officer Karneol's use of deadly force was objectively reasonable under the Fourth Amendment.  Therefore, Officer Karneol is entitled to qualified immunity on Plaintiffs' federal claims.  Although this finding is sufficient to dispose of those claims, the Court will nevertheless proceed to the second prong of the qualified immunity analysis as additional support for the finding that the defense applies here.

b.  <u>Whether Officer Karneol violated clearly established law</u>

For the second element, a plaintiff must show that the defendant violated a statutory or constitutional right that was clearly established when the violation occurred.  "A right is 'clearly established' if it would have been apparent to every reasonable officer in [Officer Karneol's] position that his use of force was unlawful."  <u>Perez</u>, 809 F. 3d at 1221-22.  The Eleventh Circuit has identified three ways in which a plaintiff can show that the right violated was clearly established:

> (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

<u>Lewis v. City of W. Palm Beach</u>, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (citations omitted).  Regardless of which method a plaintiff uses to show that the right was clearly established, "[t]he 'salient question' is whether the state of the law at the time of the incident gave [the officer] 'fair warning' that his conduct was unlawful."  <u>Perez</u>, 809 F.3d at 1222.

In their response, Plaintiffs do not argue that a broad statement or principle clearly establishes a constitutional right or that Officer Karneol's conduct was so egregious that a constitutional right was clearly violated.  Instead, Plaintiffs cite to three different cases for the proposition that Officer Karneol violated a clearly

established right.  In the analysis that follows, the Court will show why each of the cases are readily distinguishable.[4]

The first case relied upon by Plaintiffs is Perez, which involved the fatal shooting of Victor Arango by a police officer.  Id. at 1216.  In Perez, police officers were responding to an altercation between two women at a sports bar.  Id. at 1217.  When the officers arrived on scene, they encountered ten to twenty bystanders in the parking lot.  Id.  The officers immediately ordered the bystanders to get down on the ground and put their hands in the air.  Id.  Arango, a bystander, went to the ground and made no attempt to get up or resist police.  Id.  In fact, Arango was "compliant and prostrate on his stomach, with his hands behind his back."  Id.  While Arango was on the ground, one of the police officers remarked that Arango had a gun in his waistband.  Id.  Another officer then removed the gun from Arango and threw it about ten feet away.  Id.  Even though the gun had been removed from Arango, one of the police officers shot Arango twice in the back, "execution-style."  Id.

Under these facts, the Eleventh Circuit determined that "no reasonable officer would have shot Arango while he was lying prone, unarmed, and

---

[4] The Court recognizes that the cases need not be "directly on point" for a right to be clearly established.  White v. Pauly, 580 U.S. 73, 73 (2017) (per curiam).  The relevant inquiry is whether "existing precedent" placed "the statutory or constitutional question beyond debate."  Id.

compliant."  Id. at 1218.  The court observed that no evidence existed that Arango

had committed any crime or was a threat.  Id. at 1219.  The court also recognized

that there was no indication that Arango actively resisted or attempted to flee.  Id.

Finally, the court emphasized that the police officer gave no warning before using

deadly force.  Id.  As to the fact that Arango had a weapon, the Eleventh Circuit

held that

> the mere presence of a gun or other weapon is not enough to
> warrant the exercise of deadly force and shield an officer from
> suit.  Where the weapon was, what type of weapon it was, and
> what was happening with the weapon are all inquiries crucial to
> the reasonableness determination.

Id. at 1220.

Plaintiffs argue that because Decedent and Arango were both shot twice in

the back, Perez alone "clearly establishes" that Officer Karneol should have known

that his actions violated the constitution.  The Court disagrees because Perez is

easily distinguishable.  First, Perez is distinguishable because Decedent was not

lying prone and unarmed when he was shot by Officer Karneol.  Conversely,

Decedent was running from Officer Karneol with a firearm in his hand.  Second,

while Arango was compliant with the officer's commands, Decedent was

attempting to flee.  Third, unlike Perez where there was no indication that Arango

had committed any crime whatsoever and was merely a bystander at a location

19

where police were called, Decedent was a passenger in a stolen vehicle that was involved in a high-speed chase.  Given these material differences, <u>Perez</u> cannot be used to show that Officer Karneol was on notice that he was acting unlawfully.

Plaintiffs rely next on <u>Brown</u>, which arose from the fatal shooting of Jerry Dwight Brown.[5]  788 F. App'x at 670.  In <u>Brown</u>, an undercover police officer arranged to buy drugs from Brown.  <u>Id.</u> at 671.  After the drug transaction was complete and while Brown was sitting in the front passenger seat of the undercover police officer's car, Officer Cabbage, who was outside the car, "pointed his firearm at Brown through the windshield, and shouted at him to show his hands."  <u>Id.</u> Instead of putting his hands up, Brown tried to push open the passenger door but was unsuccessful because another police officer held it shut.  <u>Id.</u> at 671-72.  After Brown reached toward his right pocket with both hands, Officer Cabbage "fired three shots in quick succession at Brown through the windshield, striking him in the abdomen and in the right buttock."  <u>Id.</u> at 672.

After Brown was shot three times, he was "inactive" and no longer posed a threat.  <u>Id.</u>  When the officers opened the car door to remove Brown from the vehicle, a different officer, Officer Green, shot Brown a fourth time.  <u>Id.</u>  Officer

---

[5] Brown is not a published decision.  Unpublished cases do not serve as binding precedent and cannot be relied upon to define clearly established law.  <u>JW v. Birmingham Bd. of Educ.</u>, 904 F.3d 1248, 1260 n.1 (11th Cir. 2018).  The Court will nevertheless analyze the case in an abundance of caution.

Green had started to instruct Brown to put his hands up but did not give Brown an opportunity to comply before shooting him.  Id.  Brown ultimately died from his gunshot wounds.  Id.

The Eleventh Circuit determined that Officer Green's use of deadly force against Brown was excessive.[6]  Id. at 674.  The court reasoned that "Brown's crime, though serious, was nonviolent, and there was no evidence that Brown was armed or behaving aggressively."  Id.  Moreover, "Brown was turned away from [Officer Green] and the other officers—seriously wounded and lying prone on his stomach across the center console—when [Officer Green] shot him in the back." Id.  At the conclusion of the Eleventh Circuit's analysis as to Officer Green's use of force, the Eleventh Circuit stated that Officer Green's conduct—"shooting Brown in the back as he lay prone, face down, and unresisting—was objectively unreasonable and violated Brown's Fourth Amendment right to be free from the use of excessive force."  Id. at 675.

Plaintiffs contend that Brown is analogous to this case because neither Decedent nor Brown were aggressive and because an adequate warning was not given before the shooting.  This Court recognizes that in both cases, no warning was given before the shooting.[7]  The similarities end there, however.  In Brown

---

[6] Officer Cabbage's use of force was not before the Court.
[7] As previously discussed, it was not feasible for Officer Karneol to issue a warning.

there was no evidence that Brown was armed or behaving aggressively; here, the video evidence shows that Decedent was armed.  Further distinguishing Brown, Decedent was not seriously wounded, lying prone on his stomach and no risk to officers at the time he was shot.  Instead, when Decedent was shot, he was fleeing with a firearm in his hand.  At bottom, this case does not provide Officer Karneol with "fair warning" that his conduct was unconstitutional.

The final case cited by Plaintiffs is Vaughan v. Cox, 343 F.3d 1323 (11th Cir. 2003).  In Vaughan, police were responding to a report that a red truck was stolen.  Id. at 1325-26.  Two police officers were able to locate the stolen vehicle and made efforts to stop the vehicle.  Id. at 1326.  The officers first tried a "rolling roadblock," which "involves officers blocking a suspect vehicle with their police cruisers and reducing their speed, in the hope that the suspect car will slow down as well."  Id.  When the two police officers did this, the stolen truck hit the back of one of the patrol vehicles.  Id.  Whether the hit was intentional was disputed by the parties.  After the collision, the driver did not pull over the stolen vehicle.  Id.  In response, one of the officers pulled up next to the stolen car, rolled down his window and shot three shots without warning into the car.  Id. at 1327.  One of the bullets struck Jerry Vaughan, who was the passenger, and instantly paralyzed him below the chest.  Id.

The Eleventh Circuit determined that the police officer who shot Vaughan was not entitled to qualified immunity.  First, the court held that when the police officer discharged his weapon, "he simply faced two suspects who were evading arrest and who had accelerated to eighty to eighty-five miles per hour in a seventy-miles-per-hour zone in an attempt to avoid capture."  Id. at 1330.  The court reasoned that under these facts, "a reasonable jury could find that Vaughan [and the driver's] escape did not present an immediate threat of serious harm to [the police officer] or others on the road."  Id.  Second, the court found that deadly force was not necessary to prevent escape as the stolen truck could have easily been followed by other officers in their patrol vehicles.  Id. at 1331.  Finally, the court determined that a reasonable jury could conclude that it was feasible for the officer to warn Vaughan (and the driver) about the potential use of deadly force because the officer traveled alongside the stolen truck for approximately thirty to forty-five seconds before firing his weapon.  Id.

Plaintiffs contend that Vaughan is analogous because both cases arise out of a stolen vehicle pursuit where the passenger was shot.  Although both cases involve a passenger in a vehicle, Officer Karneol was not "simply" facing two suspects who were evading arrest and speeding to avoid capture.[8]  Here, Officer

---

[8] Plaintiffs argue that in Vaughan the driver "dangerously" rear-ended the officer's patrol vehicle.  It is worth recognizing that this fact was disputed and construed in favor of the

Karneol was faced with a suspect who was fleeing while carrying a firearm in his hand. It does not appear that a firearm was involved in Vaughan at all. Moreover, Officer Karneol did not shoot his weapon into the Nissan Altima. Unlike Vaughan, who did not pose an immediate danger to the police officers, the presence of a firearm in Decedent's hand shows that Decedent's escape did present an immediate threat of serious harm to Officer Karneol. Finally, unlike in Vaughan where the police officer had thirty to forty-five seconds to warn of his use of deadly force, the sequence of events in this case (Decedent's exit from the stolen vehicle to the shooting) lasted only three seconds.

In sum, after review of the three cases cited by Plaintiffs, the Court concludes that even if it could be argued that Officer Karneol violated a constitutional right, qualified immunity is appropriate because under the circumstances of this case, the right invoked was not "clearly established" at the time of the events in question.

As explained above in sections 1.a. and 1.b., Plaintiffs have not met their burden as to either of the qualified immunity elements. Thus, to the extent Defendants seek dismissal on qualified immunity grounds, the motion is **GRANTED**. Count 1 is therefore dismissed. Count 3, which alleges that Cobb

---

plaintiff. Under the plaintiff's version of events, the driver accidentally and softly rear-ended the officer's patrol vehicle.

County promulgated and established policies that caused Officer Karneol to use excessive force, is also dismissed because Plaintiffs' claim against Cobb County is a derivative claim based on Officer Karneol's conduct.  See Cantrell, 805 F. App'x at 822 (recognizing that no policy-based liability exists "when there is no underlying constitutional violation").  Moreover, Count 7, which seeks reasonable attorney's fees and expenses of litigation related to the federal claim, is likewise dismissed as derivative.

### 2.  State Law Claims

Plaintiffs bring four state law claims against Defendants, which are before the Court pursuant to the Court's supplemental jurisdiction.  In their Motion to Dismiss, Defendants ask the Court to retain supplemental jurisdiction and dismiss Plaintiffs' state law claims on the merits.

28 U.S.C. § 1367 "empowers [a] trial court to decline to exercise supplemental jurisdiction over a state law claim if it has dismissed all of the related claims over which it has jurisdiction."  Engelhardt v. Paul Revere Life Ins. Co., 139 F.3d 1346, 1350 (11th Cir. 1998).  In assessing whether to retain or reject supplemental jurisdiction, a court should consider the following factors:  judicial economy, convenience, fairness and comity.  West v. City of Albany, 830 F. App'x 588, 597 (11th Cir. 2020).  Notably, the Eleventh Circuit has stated that in the

usual case where all federal claims are dismissed before trial, the balance of the factors "will point toward declining to exercise jurisdiction over the remaining state-law claims." Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1296 (11th Cir. 2018); see also Estate of Owens v. GEO Grp., Inc., 660 F. App'x 763, 775 (11th Cir. 2016) ("This Court has repeatedly said that, when all of the federal claims have been dismissed pretrial, Supreme Court case law 'strongly encourages or even requires dismissal of the state claims.'")

In considering the first three factors (convenience, fairness and judicial economy), it is important to recognize that this case is still in its earliest stages. The only substantive filing has been the instant motion. Importantly, Defendants have not answered, and discovery has not opened. In declining to exercise jurisdiction at this stage, inconvenience or unfairness to the parties would be virtually non-existent. The parties will not need to expend substantial additional resources to refile the matter in state court or refile the dismissal motion. As to the comity factor, the Court notes that "[r]esolution of Plaintiffs' state law claims depends on determinations of state law. State court, not federal courts, should be the final arbiters of state law." Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997). This principle—that Georgia state law claims are best resolved by Georgia courts—"is especially true . . . where the Court is

dismissing Plaintiffs' federal law claim[s] prior to trial." Id.  Comity thus "decidedly weighs in favor of dismissal."  Estate of Owens, 660 F. App'x at 775.

After considering all of the factors, the Court declines to exercise supplemental jurisdiction over the remaining claims.  Plaintiffs' state-law claims are thus **DISMISSED WITHOUT PREJUDICE**.[9]  See Harris-Billups v. Anderson, 555 F. Supp. 3d 1328, 1343-44 (N.D. Ga. 2021) (declining to exercise supplemental jurisdiction over state law claims after finding that a police officer was entitled to qualified immunity).

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss [Doc. 17] is **GRANTED**.  The federal claims are **DISMISSED WITH PREJUDICE**, and the state claims are **DISMISSED WITHOUT PREJUDICE**.  The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 29th day of August, 2022.

J. P. BOULEE
United States District Judge

---

[9] "When a court decides not to exercise supplemental jurisdiction under § 1367(c)(3) because only state claims remain, the proper action is a dismissal without prejudice so that the complaining party may pursue the claim in state court."  Ingram v. Sch. Bd. of Mia.-Dade Cnty., 167 F. App'x 107, 109 (11th Cir. 2006).